Gazi Abdulhay, Ali Abdulhay, :
Nabil Abdulhay, and Valley Land :
Holdings, LLC, :
              Appellants :
               :
        v. :
               :
Upper Macungie Township :
Zoning Hearing Board and :
Allentown SMSA L.P. d/b/a : No. 1313 C.D. 2024
Verizon Wireless : Argued: September 10, 2025

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE STACY WALLACE, Judge
               HONORABLE MATTHEW S. WOLF, Judge

OPINION
BY JUDGE FIZZANO CANNON               FILED: July 1, 2026

        Gazi Abdulhay, Ali Abdulhay, Nabil Abdulhay, and Valley Land Holdings, LLC (collectively, Objectors) appeal from the September 20, 2024 order of the Court of Common Pleas of Lehigh County (Common Pleas) affirming a decision of the Upper Macungie Township (Township) Zoning Hearing Board (Board). Based on the federal Telecommunications Act of 1996 (TCA),[1] which forbids local zoning ordinances to materially inhibit cellular service and improvement thereof, the Board granted to Allentown SMSA L.P. d/b/a Verizon Wireless (Applicant) a use variance, a dimensional height variance, and a requested

_____

[1] 47 U.S.C. §§ 151-624 & 641-646.

variance to allow the construction of a driveway to service a proposed 190-foot cellular tower (Tower) in the Township's RU3 Zoning District, in which the Tower is not a permitted use and also exceeds the 50-foot height limitation. Objectors argue that the Board erred because Applicant failed to provide substantial evidence to support the variances under the Pennsylvania Municipalities Planning Code (MPC).[2] Upon review, we affirm Common Pleas' order, albeit on a somewhat different basis.

## I. Background

Applicant requested three use and dimensional variances related to its proposed erection of the Tower[3] on a tract of land (Property) in the Township's RU3 Zoning District, which is a rural district where commercial cell towers and towers over 50 feet are not permitted. *See* UPPER MACUNGIE TWP., PA., CODE OF ORDINANCES, ch. 27 (Zoning Ordinance), §§ 27-301, 27-306, 27-402 & 27-802 (1994, *as amended*). The Board found that Verizon satisfied the requirements of Section 910.2 of the MPC, 53 P.S. § 10910.2,[4] and granted the variances with conditions.[5] Objectors appealed to Common Pleas, which affirmed without taking additional evidence, finding that the testimony of Applicant's engineers relating to signal strength and cell coverage in the area constituted substantial evidence in support of the Board's decision. Objectors then appealed to this Court.

---

[2] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

[3] The Tower itself would be 185 feet tall and would be topped by a 5-foot lightning rod. Reproduced Record (R.R.) at 6a.

[4] Added by the Act of December 21, 1988, P.L. 1329.

[5] The Tower would need to be enclosed by a fence, equipment would need to be placed at the bottom of the Tower, and the driveway would need to be 10 feet wide and follow a pre-existing road across the Property. *See* R.R. at 6a.

## II. Issues

On appeal,[6] Objectors offer several arguments. First, Objectors assert that the Board erred by granting the requested variances because the application for the use, dimensional, and driveway variances was not supported by substantial evidence. Next, Objectors contend that the Board erred by ruling that the TCA compelled the issuance of the requested variances. Finally, Objectors argue that the Board erred by considering the testimony of Applicant's proffered witnesses as expert testimony when the witnesses were not qualified as experts.

In response, Applicant contends that a denial of its variance requests would materially inhibit its ability to provide adequate cell service to the area, in violation of the TCA. Applicant insists the evidence and testimony established that the proposed location of the Tower was the only feasible solution to satisfy the design objectives and improve cell service for the area in question. Further, Applicant maintains that substantial evidence established the need to locate the Tower on the Property to improve inadequate cell service for the area.

## III. Discussion

### A. The Board's Variance Analysis

"A variance is an extraordinary exception and should be granted sparingly[.]" *Heisterkamp v. Zoning Hearing Bd. of Lancaster*, 383 A.2d 1311, 1314 (Pa. Cmwlth. 1978). Section 910.2(a) of the MPC provides that a zoning hearing

---

[6] In zoning appeals where a common pleas court has taken no additional evidence, this Court's review is generally limited to determining whether the zoning hearing board's findings are supported by substantial evidence or whether the zoning hearing board made an error of law in rendering its decision. *Twp. of Exeter v. Zoning Hearing Bd. of Exeter Twp.*, 962 A.2d 653, 659 (Pa. 2009).

board may grant a requested variance only where it finds that an applicant has established  all of the following conditions:

> (1) That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property and that the unnecessary hardship is due to such conditions and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located.

> (2)  That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property.

> (3)  That such unnecessary hardship has not been created by the [applicant].

> (4) That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare.

> (5) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

53 P.S. § 10910.2(a).

In zoning matters, "determinations as to the credibility of witnesses and the weight to be given to evidence are matters left solely to the [Board] in the performance of its factfinding role." *Pennsy Supply, Inc. v. Zoning Hearing Bd. of Dorrance Twp.*, 987 A.2d 1243, 1248 (Pa. Cmwlth. 2009) (internal brackets omitted).  Further, "the Board has the power to reject even uncontradicted testimony

4

if it finds it lacking in credibility[.]" *Lower Allen Citizens Action Grp., Inc. v. Lower Allen Twp. Zoning Hearing Bd.*, 500 A.2d 1253, 1258 (Pa. Cmwlth. 1985). The determination of whether an applicant has adduced evidence sufficient to allow a zoning hearing board to grant a variance is the function of the Board and will not be overturned on appeal unless it is not supported by substantial evidence. *In re Towamencin Twp.*, 42 A.3d 366, 370 (Pa. Cmwlth. 2012).

### 1. Use Variances

Because a use variance involves a "proposal to use the property in a manner that is wholly outside the zoning regulation," our courts have required strict proof to obtain a use variance, without employing the relaxed standard for finding hardship that has been permitted for dimensional variances. *Hertzberg v. Zoning Bd. of Adjustment of City of Pittsburgh*, 721 A.2d 43, 47 (Pa. 1998). Normally, a use variance applicant must prove that there is a unique hardship affecting the property; that granting the requested variance will not result in an adverse effect on the public health, safety, or general welfare; and that the requested variance is the minimum variance that will afford relief with the least modification possible. *See Marshall v. City of Phila.*, 97 A.3d 323, 329 (Pa. 2014); *see also Metal Green, Inc. v. City of Phila.*, 266 A.3d 495, 508 (Pa. 2021). Notably, a variance "is appropriate only where the *property*, not the person, is subject to hardship." *Yeager v. Zoning Hearing Bd. of Allentown*, 779 A.2d 595, 598 (Pa. Cmwlth. 2001) (quoting *Szmigiel v. Kranker,* 298 A.2d 629, 631 (Pa. Cmwlth. 1972)) (emphasis in original) (internal quotation marks and citation omitted).

## 2. Dimensional Variances

For a dimensional variance, as opposed to a use variance, although the same elements must be established, our Supreme Court has articulated a more relaxed standard for granting a variance requiring a lesser quantum of proof. Under this relaxed standard, when addressing the element of unnecessary hardship, "[c]ourts may consider multiple factors, including the economic detriment to the applicant if the variance was denied, the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood." *Hertzberg*, 721 A.2d at 50. However, the requirement remains that "[a] variance, whether labeled dimensional or use, is appropriate only where the *property,* not the person, is subject to hardship." *Yeager*, 779 A.2d at 598 (quoting *Szmigiel,* 298 A.2d at 631) (emphasis in original). Further, a conflict between dimensional zoning requirements and a landowner's personal preference regarding property use alone does not create a hardship meriting a variance. *Id.* (denial of dimensional variance affirmed where appellant proved "nothing more than that adherence to the [applicable zoning] ordinance imposes a burden on his personal desire to sell vehicles for [a specific automaker]").

## 3. Evidence Submitted for Variances

Here, a commercial cellular tower is not a permitted use in the RU3 Zoning District. *See* Zoning Ordinance § 27-306.2 (Permitted Use Table). Additionally, communication towers above 50 feet are not allowed in residential districts like the RU3 Zoning District. *See* Zoning Ordinance § 27-402(R)(2) ("A freestanding commercial communications tower with a height greater than 50 feet

above the natural ground level shall not be located in a residential district."). Further, commercial driveways are not allowed in the Township's residential districts. *See* Zoning Ordinance § 27-809 ("A driveway or accessway serving a commercial or industrial use shall be deemed to be integral with such use and shall not be a permitted use in a residential district. This restriction shall not apply to a driveway or accessway that will be clearly limited to use by only emergency vehicles."). Thus, Applicant's proposed Tower requires multiple variances, both use and dimensional.

Bryan Grebis, Verizon's radio-frequency design expert, testified concerning the purportedly limited cellular service in the area to be serviced by the Tower. Grebis explained that the topography of the area resulted in dropped calls and weak or no cell signal, with difficulties being exacerbated by tree coverage and in inclement weather. He explained that the Tower would boost the signal strength in the area and fill gaps in existing coverage. He maintained that the Property was the only viable placement of the Tower due to its central location and topography. Grebis further contended that simply placing the Tower in a neighboring light industrial district would not solve the problem, but would simply duplicate existing coverage.

Grebis also testified to the need for the variance from the maximum height allowance in the RU3 district. Grebis explained that the Property presents serious terrain challenges for constructing an effective but still compliant cell tower. Grebis testified that wireless is a line of sight technology, and thus requires a higher tower to see above the topography of the area. Terrain increases in the north portion of the Property require a tower of the height requested. A tower shorter than the one requested, Grebis explained, would not be able to reliably connect the RU3 area with existing areas of cell phone coverage (the network). Grebis also explained that the

7

Tower's proposed height is the absolute minimum that would accomplish a high percentage of the site's design goals.

Applicant also presented the testimony of Matthew Graubart, a civil engineer who explained that the proposed driveway would be an extension of a pre-existing road already connected to the Property. Graubart explained that the plan regarding the driveway was merely to expand and extend the pre-existing road and then connect the expanded road to a new section of road connecting to the Tower site. Graubart explained that the driveway would be a 10-foot access road that would allow for maintenance of the Tower every 4 to 6 weeks, and that such infrequent traffic would not be burdensome and would, in fact, create less traffic than if the Property were used for residential purposes.

The Board analyzed this evidence presented under the MPC requirements in conjunction with the TCA. The Board found "a compelling, unnecessary hardship which satisfies 53 P.S. § 10910.2(a)(2) by showing a reasonable use for this property in a global communication system, while its original primary use, residential, remains unchanged." Br. of Appellants, Appendix A (Board Decision) at 11. The Board further found that "science and engineering," not Applicant, "created this hardship in satisfaction of 53 P.S. § 10910.2(a)(3)." *Id.* The Board determined that the Tower would not alter the character of the neighborhood, impair appropriate use of neighboring properties, or be detrimental to the public welfare. *Id.* The Board also found that the Tower represented the least modification possible of the Zoning Ordinance. *Id.*

Common Pleas, without taking additional evidence, similarly found that, by granting the use variance, the Board "prevented a material inhibition of providing personal wireless services to residents and visitors of the RU3 district."

8

Br. of Appellants, Appendix C (Common Pleas Opinion) at 7. Common Pleas found that the existing cell towers are insufficient to service the RU3 district and that new towers in other districts would not solve the problem but would instead merely duplicate the existing issues. *Id.* Common Pleas further found that the Property's location in the center of the coverage map made it the preeminent location for the Tower. *Id.* Common Pleas found that these factors compelled the grant of the requested variance and, thus, constituted substantial evidence supporting the Board's grant of the use variance. *Id.*

Common Pleas further found that the denial of the height variance would be a material inhibition to providing cell service to area residents. *See* Common Pleas Opinion at 9. Common Pleas observed that topographical challenges exist at the Property and that the proposed height of the Tower represents the minimum deviation from the Zoning Ordinance needed to provide residents of the RU3 district with adequate reliable cell service. *See id.* Accordingly, Common Pleas found that the TCA compelled the Board's grant of the requested dimensional variance and, thus, that the Board's decision is supported by substantial evidence. *See id.*

Common Pleas similarly found that the Board's grant of the driveway variance proscribed a material inhibition to Applicant providing cell service to individuals living in the RU3 district. *See* Common Pleas Opinion at 10. Common Pleas found that, while the proposed driveway is a clear violation of the Zoning Ordinance, it "is a necessary component of the Tower and one cannot exist without the other." *Id.* Common Pleas noted that a commercial communications tower must be maintained once built, and that the proposed driveway would therefore be

9

indispensable to the Tower and is the least restrictive modification possible. *See id.* at 10-11.

We agree with the Board, albeit not fully. As stated above, the hardship criterion of a variance analysis requires a finding of

> unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions ***peculiar to the particular property*** and that the ***unnecessary hardship is due to such conditions and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district*** in which the property is located.

53 P.S. § 10910.2(a)(1) (emphasis added). Here, the Board failed to consider the hardship element of variance relief properly. Instead of considering whether the evidence showed unnecessary hardship due to physical circumstances or conditions of the Property, the Board analyzed hardship in terms of Applicant's alleged gap in cell service. Our review of the record reveals no evidence concerning unique circumstances or conditions of the Property itself. Thus, despite the Board's determination that Applicant satisfied the remaining elements of variance relief, it is evident that Applicant failed to establish the unnecessary hardship required under the MPC to obtain a use variance for placement of the Tower.

With regard to the other requested variances, we agree that the need for them was dependent on the grant of the variance for the Tower. Accordingly, the related additional variances stand or fall with the Tower use variance.

Although Applicant did not meet the MPC's hardship criterion for the Tower variance, Applicant also contends that the application of the TCA required the Board to grant relief from the limitations of the Zoning Ordinance. Accordingly, we must determine whether, considering the interplay of the TCA with the effect of

10

the Zoning Ordinance, the Board properly granted relief from zoning requirements to allow placement of the Tower.

## B. Interplay of the TCA and Local Zoning Restrictions Generally

Section 332(c)(7) of the TCA provides, in pertinent part:

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C. § 332(c)(7)(A) & (B)(i)(I-II). Thus, under the TCA, state and local governments retain general zoning authority but must comply with certain federal requirements. Municipalities cannot, through zoning ordinances, unreasonably discriminate among providers of functionally equivalent services, nor can they prohibit or have the effect of prohibiting the provision of personal wireless services. *See Fairview Twp. v. Fairview Twp. Zoning Hearing Bd.*, 233 A.3d 958 (Pa. Cmwlth. 2020) (*en banc*). Accordingly, "while Section 332(c)(7) of the TCA

11

preserves state and local governments' authority to regulate zoning, it places limitations on the general authority of state or local governments or instrumentalities thereof to make decisions regarding the placement, construction, and modification of personal wireless service facilities." *Id.* at 967 (internal quotation marks and citation omitted). However, as discussed further below, any interpretation of the TCA that would give excessive deference to a wireless service provider without any balancing of local government interests and concerns would have the impermissible effect of eliminating the intended balancing of the totality of the circumstances in favor of virtually unfettered siting choice for the service provider. *See APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 478-79 (3d Cir. 1999). We must, therefore, consider the meaning of the TCA's provisions as they affect the authority of local zoning provisions.

The FCC has offered position statements concerning its interpretation of the TCA's provisions, advising that, under the TCA, a local government impermissibly prohibits or has the effect of prohibiting the provision of personal wireless service and entitles an applicant to zoning relief where a provider shows such relief is needed to cover a gap in that provider's coverage or allow it to improve service so as to compete more effectively with other providers.[7] *See Fairview Twp.*, 233 A.3d at 966 & 968 (citing and discussing various FCC position statements). These statements would previously have been entitled to deference from courts construing provisions of the TCA, under the doctrine of judicial deference to administrative interpretations announced by the United States Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Judicial interpretation of an agency's governing statute under *Chevron*

___

[7] For convenience, our references herein to coverage "gaps" include both absences of cell signals and weak signals or other conditions necessitating service improvement.

12

required courts to determine whether Congress had spoken directly to the precise question at issue. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 379 (2024) (citing and discussing *Chevron*, 467 U.S. at 842). Then, if the statute was unclear, *i.e.*, silent or ambiguous regarding the question at issue, *Chevron* dictated that courts should defer to the agency's interpretation of the statute, provided that the agency's interpretation was "based on a permissible construction of the statute." *Id.* at 379-80 (quoting *Chevron*, 467 U.S. at 843) (additional quotation marks omitted).

Recently, however, the Supreme Court overruled *Chevron's* deference doctrine in *Loper*, holding that the judiciary "must exercise . . . independent judgment in deciding whether an agency has acted within its statutory authority . . . ." 603 U.S. at 412. Courts are free to consider an agency's interpretation of its governing statute but, under *Loper*, a court "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 412-13. The Supreme Court explained:

> Courts, after all, routinely confront statutory ambiguities in cases having nothing to do with *Chevron*—cases that do not involve agency interpretations or delegations of authority. Of course, when faced with a statutory ambiguity in such a case, the ambiguity is not a delegation to anybody, and a court is not somehow relieved of its obligation to independently interpret the statute. . . . So instead of declaring a particular party's reading "permissible" in such a case, courts use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity.
>
> In an agency case as in any other, though, even if some judges might (or might not) consider the statute ambiguous, there is a best reading all the same—"the reading the court would have reached" if no agency were involved. *Chevron*, 467 U.S.[] at 843[] n. 11 . . . . It therefore makes no sense to speak of a "permissible" interpretation that is not the one the court, after applying

13

all relevant interpretive tools, concludes is best. In the business of statutory interpretation, if it is not the best, it is not permissible.

Perhaps most fundamentally, *Chevron's* presumption is misguided because agencies have no special competence in resolving statutory ambiguities. Courts do. . . . *Chevron* gravely erred . . . in concluding that the inquiry is fundamentally different just because an administrative interpretation is in play.

*Id.* at 400-01. Accordingly, in light of the Supreme Court's holding in *Loper*, we must determine, independent of the FCC's position, the best interpretation of the TCA's effect on local zoning ordinances.

This Court previously considered the effect of the TCA on a local zoning ordinance in *Fairview Township*. There, the zoning ordinance at issue allowed cell towers only in the township's various industrial districts, which totaled only about eight percent of the township's area. 233 A.3d at 960. Both the zoning hearing board and, on appeal, the county court of common pleas granted variances for placement of a cell tower outside the permitted districts, concluding that the TCA prohibited denial of the variances. *Id.* at 960-61. The common pleas court granted the variances despite having found that the applicant failed to satisfy three of the five requirements for variance relief under the MPC. *Id.* at 961. The common pleas court concluded that "a denial of the variances would effectively prohibit [the applicant] from providing seamless wireless service in [the t]ownship in violation of Section 332(c)(7)(B)(i)(II) of the TCA." *Id.* at 965 (internal quotation marks omitted). Notably, the common pleas court relied on the application of *Chevron* deference by the United States Court of Appeals for the Third Circuit in its pre-*Loper* decision in *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493 (3d Cir. 2008), in which the federal court concluded that "if a court of appeals interprets an ambiguous statute one way,

14

and the agency charged with administering that statute subsequently interprets it another way, even that same court of appeals may not then ignore the agency's more recent interpretation." *Fairview Twp.*, 233 A.3d at 968 (quoting *Levy*, 544 F.3d at 502) (additional quotation marks omitted).

On review, this Court observed that the applicant had failed to address the issue of unnecessary hardship and, thus, had not established that required element of variance relief. *Id.* at 962-64. We then considered the effect of the TCA on the availability of zoning relief, specifically the meaning of the TCA's provision that local government may not "prohibit or have the effect of prohibiting the provision of personal wireless services." *Id.* at 965 (quoting Section 332(c)(7)(B)(i)(II) of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(II) (additional quotation marks omitted)). We relied, in part, on the FCC's position that "where a *bona fide* local zoning concern, rather than the mere presence of other carriers, drives a zoning decision, . . . the TCA does not 'trump' the MPC with respect to the placement of wireless telecommunications towers." *Id.* at 969 (quoting *In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance*, 24 F.C.C.R. 13994 ¶ 56-61 (Nov. 18, 2009) at 14018 ¶ 62) (additional quotation marks omitted).

We observe that *Fairview Township* and the FCC position statements and caselaw on which our *Fairview Township* decision was based were decided prior to the United States Supreme Court's decision in *Loper*. Accordingly, this Court followed *Chevron* and deferred to the FCC's position statements. In light of the abrogation of *Chevron* deference by the *Loper* decision, however, we conclude that

15

our analysis in *Fairview Township* is not fully applicable here, as it was based on *Chevron* deference to the FCC's interpretation of the TCA.[8]

In 2023, still before *Loper*, the United States Court of Appeals for the Third Circuit decided *Cellco Partnership v. White Deer Township Zoning Hearing Board*, 74 F.4th 96 (3d Cir. 2023). There, the Third Circuit again applied *Chevron* deference, observing that the TCA's provision was not unambiguous and that the FCC's interpretation of it was reasonable. 74 F.4th at 102-06. The Third Circuit explained that "[u]nder the [FCC's] 'materially inhibit' standard, local government action 'constitutes an effective prohibition if it materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory market.'" *Id.* at 102 (quoting FCC standard). The Third Circuit was critical of this Court's decision in *Fairview Township*, suggesting it was inconsistent with the FCC's position. *Id.* at 106. Thus, the Third Circuit's criticism of *Fairview Township* was based on its application of *Chevron* deference to the agency's interpretation. Like *Fairview Township*, the *Cellco* decision is inapplicable here to the extent that it was based on *Chevron* deference to the agency's interpretation.

In its analysis of whether *Chevron* was applicable, however, the Third Circuit in *Cellco* also discussed its previous application of a two-part test (which was not dependent on any FCC position) for determining whether a local zoning ordinance had the "effect of prohibiting" the provision of cell phone service. *Cellco*, 74 F.4th at 102-03 (first citing *APT*, 196 F.3d at 479; and then citing *Sprint Spectrum,*

---

[8] We observe that our decision here does not improperly overrule prior decisions. *Loper* constitutes a sweeping abrogation of *Chevron* deference. As such, it has fundamentally changed how courts must view administrative interpretations of agencies' governing statutes. *Loper* mandates that our interpretations of such statutes henceforward must be independent rather than deferring to agency interpretations. If such independent interpretations conflict with previous decisions, that is a necessary consequence of complying with the holding of *Loper*.

16

*L.P. v. Willoth*, 176 F.3d 630, 639 (2d Cir. 1999)).  Under this two-part test, "[f]irst, the provider must prove there is a significant gap in wireless service and, second, the provider must show it is filling that gap in the least intrusive manner."  *Cellco*, 74 F.4th at 100.

Notably, the Third Circuit explained in *Cellco* that it had adopted the Second Circuit's two-part *Willoth* test in *APT* as "persuasive . . . because it was '[t]he most thoughtful discussion we have found' and the reading that 'effects the best accommodation of the two primary goals of the TCA.'"  *Cellco*, 74 F.4th at 102 (quoting *APT*, 196 F.3d at 479-80).  Thus, the Third Circuit's reasoning in *APT* appears to have been consistent with the United States Supreme Court's subsequent directive in *Loper* that a court, rather than deferring to an administrative agency, must itself "determine the best reading of the statute."  *Loper*, 603 U.S. at 373.

Other than decisions of the United States Supreme Court, federal court decisions construing federal statutes are not binding precedents for state courts, but "such decisions in factually similar cases with persuasive legal analysis may inform our disposition of the matter before us."  *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 639 n.14 (Pa. Cmwlth. 2021).  Accordingly, we will examine the reasoning of *APT* and *Willoth* to determine the persuasiveness of the two-part "effect of prohibiting" test.

As this Court has explained, "[t]he TCA strikes a balance between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers."  *Fairview Twp.*, 233 A.3d at 971-72 (quoting *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 531 (2d Cir. 2005) (additional quotation marks and citation omitted)).  In analyzing this balance and whether a zoning ordinance has "the effect of prohibiting

17

the provision of personal wireless services" in violation of the TCA, the Third

Circuit reasoned:

> [E]very municipality's denial of an application to build a wireless service facility will have, to a degree, the "effect of prohibiting personal wireless service" because it will preclude the applicant provider from building a facility to serve its customers. Interpreting the TCA's "effect of prohibiting" clause to encompass every individual zoning denial simply because it has the effect of precluding a specific provider from providing wireless services, however, would give the TCA preemptive effect well beyond what Congress intended. *See Town of Amherst v. Omnipoint Comm[c'ns] Enter[s.], Inc.*, 173 F.3d 9, 14 (1st Cir. 1999) ("Obviously, an individual denial is not automatically a forbidden prohibition violating the 'effects' provision."); . . . *Willoth*, 176 F.3d [at] 639 (rejecting claim that individual denial violates "effects" provision because it would require court to "read the TCA to allow the goals of increased competition and rapid deployment of new technology to trump all other important considerations, including the preservation of the autonomy of states and municipalities."); *AT&T Wireless PCS, Inc. v. Virginia Beach*, 155 F.3d 423, 428 (4th Cir. 1998) ("Any reading of subsection(B)(i)(II) that allows the subsection to apply to individual decisions would effectively nullify local authority by mandating approval of all (or nearly all) applications . . ."); *OmniPoint Comm[c'ns], Inc. v. Scranton*, 36 F. Supp. 2d 222, 233 (M.D. Pa. 1999) ("Were courts to hold that merely because there are some gaps in service in an area . . . the public interest necessarily tips the balance in favor of allowing a variance, local boards would be obliged to approve virtually every application.") (quoting *Cellular Tel[.] Co. v. Borough of Ho-Ho-Kus*, 24 F. Supp. 2d 359, 374-75 (D.N.J. 1998)); *Primeco Pers[.] Comm[c'ns] Ltd. P[']ship*, 1998 U.S. Dist. LEXIS 22603, No. 97-208- CIV-OC-10B, 1998 WL 565036, at *12 (M.D. Fla. 1998) ("§ 332(c)(7)(B)(i)(II) is intended to limit general bans or policies that prohibit or have the effect of prohibiting the provision of wireless services. Any decision to the contrary would be at odds with the plain text of

§ 332(c)(7)(A), which expressly reserves the bulk of zoning authority to local governing bodies."); *Virginia Metronet Inc. v. B[d.] of Supervisors of James City Co.*, 984 F. Supp. 966, 971 (E.D. Va. 1998) (accepting argument that § 332(c)(7)(B)(i)(II) applies simply to individual denials "would be tantamount to the complete preemption of local authority in areas previously unserved by cellular services [and would be] at odds with the plain text of 47 U.S.C. § 332(c)(7)(A), which expressly reserves the bulk of zoning authority to local governing bodies[]").

We agree with these courts that the "effect of prohibiting" clause cannot be so construed. To do so would provide wireless service providers with a wildcard that would trump any adverse zoning decision that impaired their ability to provide wireless service, and would thereby create the proverbial "exception that swallowed the rule" that would be entirely inconsistent with § 332(c)(7)'s structure. . . .

This does not mean, however, that a provider can never establish that an individual adverse zoning decision has the "effect" of violating § 332(c)(7)(B)(i)(II). Rather, it only means that the provider must bring additional proof to the court to demonstrate that the denial is representative of a broader policy or circumstance that precludes the provision of wireless service. . . .

*APT*, 196 F.3d at 478-79.

We agree with much of the reasoning of *APT*. In particular, as we previously stated in *Fairview Township*, the TCA is expressly intended to create a balance between the need for cell service and the retention of local municipal autonomy. *Fairview Twp.*, 233 A.3d at 971-72.

As stated above, the *APT* court relied on the Second Circuit's analysis in *Willoth* to determine how to strike this balance, explaining:

After parsing the text of the TCA, the Court [in *Willoth*] described the focus of subsection 332(c)(7)(B)(i)(II)'s prohibition in the following terms:

19

By speaking in terms of communications between land stations (cell sites that connect directly to land-lines) and mobile stations (wireless telephones) and access to facilities necessary to make and receive phone calls, the plain focus of the statute is on whether it is possible for a user in a given remote location to reach a facility that can establish connections to the national telephone network. In our view, therefore, the most compelling reading of subsection B(i)(II) is that local governments may not regulate personal wireless service facilities in such a way as to prohibit remote users from reaching such facilities. In other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines.

[*Willoth*, 176 F.3d] at 642-43.

. . . .

The [*Willoth* c]ourt further pointed out that, since the focus is on the remote users' access to the national telephone network, the authority of the local board to deny applications is greater where the area which the provider applicant seeks to serve is already served by another provider:

Furthermore, once an area is sufficiently serviced by a wireless service provider, the right to deny applications becomes broader: State and local governments may deny subsequent applications without thereby violating subsection B(i)(II). The right to deny applications will still be tempered by subsection B(i)(I), which prohibits unreasonable discrimination. However, it is not unreasonably discriminatory to deny a subsequent application for a cell site that is substantially more intrusive than existing cell sites by virtue of its structure, placement or cumulative impact.

*Id.*

The ultimate holding of the *Willoth* [c]ourt was that the "[TCA's] ban on prohibiting personal wireless services precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines." *Willoth*, 176 F.3d at 643.[] We conclude that this reading of subsection 332(c)(7)(B)(i)(II) effects the best accommodation of the two primary goals of the TCA. It preserves the authority of state and local land use planners to the maximum extent consistent with assuring the access of remote users of personal wireless services to the national telephone network.

Given this understanding of subsection 332(c)(7)(B)(i)(II), it is unnecessary for a provider whose application has been denied to show an express ban or moratorium, a consistent pattern of denials, or evidence of express hostility to personal wireless facilities. On the other hand, it is necessary for the provider to show more than that it was denied an opportunity to fill a gap in its service system.

*APT*, 196 F.3d at 479-80 (footnotes omitted).

Upon careful consideration, we cannot agree with the suggestions of *Willoth* and *APT* that zoning relief may be denied merely on the basis that another provider already offers cell service in the location at issue. In this Court's view, such a construction would have anticompetitive consequences that would tip the TCA's careful balance unduly toward local governments.

We do agree, however, with the proposition that a provider must show more than merely a gap in service coverage in order to obtain zoning relief pursuant to the TCA. Relying on *Willoth*, the Third Circuit reasoned in *APT* that

[l]ocal boards may insist that service gaps be closed by the least intrusive means:

A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be

21

closed by less intrusive means. *See Town of Amherst*, 173 F.3d 9, 1999 WL 174253, at \*5 ("Individual denial is not automatically a forbidden prohibition," but disallowing "the only feasible plan . . . might amount to prohibiting wireless service."). There are numerous ways to limit the aesthetic impact of a cell cite. It may be possible to select a less sensitive site, *see Gearon & Co. v. Fulton C[nty.]*, 5 F. Supp. 2d 1351, 1355 (N.D. Ga. 1998), to reduce the tower height, *see Town of Amherst*, 173 F.3d 9, 1999 WL 174253, at \*6, to use a preexisting structure or to camouflage the tower and/or antennae, *see e.g.*, *Cellco P[']ship v. Town Plan & Zoning Comm'n of Farmington*, 3 F. Supp. 2d 178, 185, 186 (D. Conn. 1998) (describing antennae placed on water tower, and permitting applicant to reconstruct church steeple with six antennae placed inside); *Smart SMR of New York, Inc. v. Zoning Comm'n of Stratford*, 995 F. Supp. 52, 59 (D. Conn. 1998) (describing an antenna placed on a billboard and current applicant seeking to conceal tower with seven evergreen trees).

*APT*, 196 F.3d at 479 (quoting *Willoth*, 176 A.3d at 643).

As the above discussion illustrates, whether a provider seeking zoning relief is proposing to fill a service gap through the least intrusive means possible and, relatedly, whether a local zoning decision "has the effect of prohibiting personal wireless services" impermissibly under the TCA, are highly fact-intensive determinations. Section 332(c)(7)(B)(iii) of the TCA provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).[9]

---

[9] We note the Third Circuit's conclusion that "the substantial evidence review contemplated by [the TCA] is not applicable to the issue of whether a state's denial of an

22

Here, as discussed above, we conclude that a proper analysis required, first, a determination of whether Applicant met the MPC requirements for the requested variances. If those requirements had been met, no TCA analysis would have been needed. The Board permissibly determined that Applicant did not create any hardship; that the Tower would not alter the character of the neighborhood, impair appropriate use of neighboring properties, or be detrimental to the public welfare; and that the Tower represented the least modification possible of the Zoning Ordinance. *See* Board Decision at 11. However, in analyzing the hardship element of the variance request, the Board had before it no evidence concerning the MPC's hardship requirement of a condition or circumstance unique to the Property, and thus, the Board analyzed no such evidence of hardship. Instead, the Board essentially substituted a portion of a TCA analysis for an MPC hardship analysis, thereby finding that the hardship to Applicant and/or the public, rather than a hardship to the Property, supported variance relief.

Because Applicant offered no evidence concerning hardship as required by the MPC, Applicant necessarily did not meet the MPC's variance requirements. Therefore, the Board was required to undertake an analysis of whether Applicant established entitlement to zoning relief under the TCA – separately, and not as part of a variance analysis under the MPC – by demonstrating that there is a significant coverage gap and that Applicant's proposal would fill that gap by the least intrusive means, as determined pursuant to the evidentiary framework applied in *APT* and *Willoth* discussed above. Although the Board did not correctly separate its MPC

application to construct a personal wireless service facility has the effect of prohibiting the provision of personal wireless services." *APT*, 196 F.3d at 475 (citing *Cellular Tel. v. Zoning Bd. of Adjustment of Ho-Ho-Kus*, 24 F. Supp. 2d 359 (3d Cir. 1999)). Instead, "[t]hat decision is to be made *de novo* by a reviewing court . . . ." *Id.*

analysis from its TCA analysis, we conclude that its decision sufficiently satisfied the TCA's requirements in the circumstances of this case.

We have no difficulty in agreeing with the Board that Applicant established the necessary gap in coverage. Regarding whether the Tower represents the least intrusive means of filling that gap, Applicant offered evidence, as set forth above, that the Property was the only viable location for the Tower due to its central location and topography, that the Property presents serious terrain challenges requiring a higher tower to compensate for the topography of the area, that a shorter tower would not reliably connect the RU3 Zoning District with the rest of Applicant's existing network, and that the Tower's proposed height is the absolute minimum that would accomplish Applicant's and the public's needs. *See* Board Decision at 11. In the face of these various indications that Applicant was pursuing the least intrusive means of providing the necessary service improvement, Objectors offered no rebuttal through other factors such as the availability of attachment to other towers or structures, camouflage, etc. Although the Board did not expressly structure its TCA discussion to follow the *Willoth* analysis we adopt herein, we conclude that the Board's findings and conclusions, together with the evidence of record, sufficed to meet the TCA's requirements for overcoming Applicant's inability to fully meet the MPC's variance criteria.

Further, because, as noted above, we agree that the other related variances stand or fall with the use variance for the Tower, we agree that the Board properly granted the additional variances, as well. Accordingly, we affirm the Board's grant of variance relief.

## C. Evidentiary Rulings

Appellants also claim that the Board erred by accepting the testimony of Grebis and Graubart. We disagree.

As Common Pleas correctly noted, under the MPC, the formal rules of evidence do not apply to zoning hearing board proceedings. *See* 53 P.S. § 10908(6) ("Formal rules of evidence shall not apply, but irrelevant, immaterial, or unduly repetitious evidence may be excluded."). Further, no objection was made at the hearing to the testimony of either witness; accordingly, any such objection was waived. *See Weiler v. Stroud Twp. Zoning Hearing Bd.*, 300 A.3d 1121, 1131 n.4 (Pa. Cmwlth. 2023) (quoting *Harrisburg Gardens, Inc. v. Susquehanna Twp. Zoning Hearing Bd.*, 981 A.2d 405, 415 (Pa. Cmwlth. 2009) (observing that "a party who fails to raise an issue before a municipal zoning hearing board is precluded from doing so for the first time on appeal")). Therefore, the Board did not err by considering Grebis's and Graubart's testimony.

## IV. Conclusion

Based on the foregoing discussion, we affirm Common Pleas' order, albeit based on a somewhat different analysis from that applied by the Board and Common Pleas.

_____
CHRISTINE FIZZANO CANNON, Judge

25

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gazi Abdulhay, Ali Abdulhay,           :
Nabil Abdulhay, and Valley Land        :
Holdings, LLC,                         :
                Appellants             :
                                       :
       v.                          :
                                       :
Upper Macungie Township                :
Zoning Hearing Board and               :
Allentown SMSA L.P. d/b/a              :    No. 1313 C.D. 2024
Verizon Wireless                       :

# **O R D E R**

AND NOW, this 1st day of July, 2026, the September 20, 2024 order of the Court of Common Pleas of Lehigh County is AFFIRMED.

 

 

_____
CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gazi Abdulhay, Ali Abdulhay,&#32;&#32;&#32;&#32;&#32;:
Nabil Abdulhay, and Valley Land&#32;&#32;:
Holdings, LLC,&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;:
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;Appellants&#32;&#32;&#32;:
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;:
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;v.&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;:&#32;&#32;&#32;No.  1313 C.D. 2024
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;:&#32;&#32;&#32;Argued:  September 10, 2025
Upper Macungie Township Zoning&#32;&#32;:
Hearing Board and Allentown SMSA&#32;&#32;:
L.P. d/b/a Verizon Wireless&#32;&#32;&#32;&#32;&#32;&#32;:

BEFORE:&#32;&#32;&#32;&#32;HONORABLE RENÉE COHN JUBELIRER, President Judge
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;HONORABLE PATRICIA A. McCULLOUGH, Judge
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;HONORABLE MICHAEL H. WOJCIK, Judge
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;HONORABLE CHRISTINE FIZZANO CANNON, Judge
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;HONORABLE LORI A. DUMAS, Judge
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;HONORABLE STACY WALLACE, Judge
&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;HONORABLE MATTHEW S. WOLF, Judge

CONCURRING OPINION BY
PRESIDENT JUDGE COHN JUBELIRER&#32;&#32;&#32;&#32;&#32;&#32;&#32;&#32;FILED:  July 1, 2026

Congress enacted the federal Telecommunications Act of 1996 (TCA)[1] "to promote competition and **reduce regulation** in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (emphasis added); *accord Reno v. Am. C.L. Union*, 521 U.S. 844, 857 (1997).[2]  One way the TCA achieves this goal is by **mandating** that state and local governments "**not**

---

[1] 47 U.S.C. §§ 151-624, 641-46.

[2] While not bound by lower federal court cases, the Court is "bound by the decisions of the U.S. Supreme Court on questions of federal law." *In re Stevenson*, 40 A.3d 1212, 1221 (Pa. 2012).

**prohibit** or have the **effect of prohibiting** the provision of personal wireless services" when regulating "the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(B)(i)(II) (emphasis added). In the case at bar, the Upper Macungie Township (Township) Zoning Hearing Board (Board) granted the application of Allentown SMSA L.P. d/b/a Verizon Wireless (Verizon) to construct a personal wireless service facility because the facility is **necessary** to improve **inadequate service**. I believe the Court of Common Pleas of Lehigh County (Common Pleas) correctly affirmed the Board because denying Verizon's application would **materially inhibit** the provision of personal wireless services in violation of § 332(c)(7)(B)(i)(II). Although I thus agree with the Majority's affirmance of Common Pleas, respectfully, I am compelled to write separately because the Majority's interpretation and application of § 332(c)(7)(B)(i)(II) is antithetical to the meaning, purpose and intent of this landmark act of Congress.

## I.

The TCA provides that state and local governments, and the instrumentalities thereof, "shall not prohibit or have the effect of prohibiting the provision of personal wireless services" when regulating "the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(B)(i)(II). Importantly, the Supreme Court of the United States has determined that the TCA is a "specific **limitation**" on "'the **traditional authority** of state and local governments to regulate the location, construction, and modification' of wireless communications facilities." *T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293, 300 (2015) (emphasis added) (citation omitted). Therefore, state and local governments "can operate to the full extent of their power when regulating the placement of cell towers

and the like, **as long as** their actions **do not** have 'the effect of prohibiting personal wireless services.'" *Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*, 74 F.4th 96, 106 (3d Cir. 2023) (emphasis added).

In general, in Pennsylvania, "[m]unicipalities are creatures of the state and have no inherent powers of their own" but "possess only such powers of government as are expressly granted to [the municipality] and as are necessary to carry the same into effect." *City of Philadelphia v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004) (citation omitted). Pursuant to Section 601 of the Pennsylvania Municipalities Planning Code (MPC),[3] municipalities "may enact, amend and repeal zoning ordinances to implement comprehensive plans and to accomplish any of the purposes of [the MPC]." 53 P.S. § 10601. "Zoning ordinances, however, are not immutable and the public may seek relief from their strictures through variances." *Metal Green Inc. v. City of Philadelphia*, 266 A.3d 495, 506 (Pa. 2021). Ordinarily, to obtain a variance from the zoning requirements imposed by a municipality, the applicant must establish:

> (1) That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the **particular property** and that the **unnecessary hardship** is due to such conditions and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located.
>
> (2) That because of such physical circumstances or conditions, there is no possibility that the **property** can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the **property**.

---

[3] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. § 10101-11202.

(3) That such unnecessary hardship has not been created by the appellant.

(4) That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare.

(5) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

Section 910.2(a) of the MPC, 53 P.S. § 10910.2(a) (emphasis added);[4] *see also* UPPER MACUNGIE TWP., PA., CODE OF ORDINANCES, ch. 27, § 27-111(5)(C)(2) (1994, *as amended*). And, ordinarily, the standard for when a variance "is appropriate is where the **property**, not the person, is subject to hardship." *Yeager v. Zoning Hearing Bd. of the City of Allentown*, 779 A.2d 595, 598 (Pa. Cmwlth. 2001) (emphasis added) (citation omitted).

However, hardship to the property is **not a relevant inquiry** in determining whether the restriction will have the effect of prohibiting the provision of wireless service. Whether there is a sufficient hardship of or to the property has **no bearing** on whether the local zoning board's decision has the effect of prohibiting personal wireless services as the decision can violate the TCA even if it is lawful under state and local law. *See Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 20 (1st Cir. 2002). Instead, the **effects** of the restriction that are at issue are to the public, the individuals served by the telecommunications provider, and the provider, and **not** the property on which the provider needs to locate a personal wireless service facility. Thus, contrary to the Majority's conclusion, the Board and Common Pleas did **not** improperly analyze the interplay between the TCA and the MPC or, specifically, the hardship requirement for variance relief. It is the Majority

---

[4] Added by the Act of December 21, 1988, P.L. 1329.

RCJ - 4

that improperly faults the Board for "essentially substitut[ing] a portion of a TCA analysis for an MPC hardship analysis, thereby finding that the hardship to [Verizon] and/or the public, rather than a hardship to the [p]roperty, supported variance relief." *Abdulhay v. Upper Macungie Twp. Zoning Hearing Bd.*, ___ A.3d ___, ___ (Pa. Cmwlth., No. 1313 C.D. 2024, filed July 1, 2026), slip op. at 23; *see also Fairview Township v. Fairview Twp. Zoning Hearing Bd.*, 233 A.3d 958 (Pa. Cmwlth. 2020).[5]

I believe the Board and Common Pleas **properly applied** the TCA **in conjunction** with the MPC. The Board, "mindful of the limitation on [its] authority" imposed by the TCA, reviewed Verizon's variance application under the MPC. (Board's Decision at 10.) The Board found portions of the Township experience wireless service issues, including "**lack of service, lost calls, or poor quality calls**," because "there is **weak or no or little signal strength, while at the same time there is more wireless traffic yielding poor or no wireless service**." (*Id.* at 4 (emphasis added).) To resolve these issues, Verizon requested variances to construct a 190-foot cell tower on a 54.82-acre parcel in the Township. Verizon "recommend[ed] installing [the] additional wireless facility for the area on the subject premises to improve wireless service in this part of the [T]ownship so that continuous, wireless service more reliably reaches more customers." (*Id.* at 5.) Acknowledging that for "a nationwide telecommunications cell phone system, [one] must account for electronic waves needing to travel here over rolling, or even mountainous, topography, which necessitates another tower for this area to successfully do so,"

---

[5] In *Fairview*, this Court held that it "cannot be the case" that "insufficiency in coverage is a hardship entitling the provider to a variance" because the hardship is not to the property but "an economic hardship" to the provider. 233 A.3d at 970. Consequently, this Court reversed a common pleas court's decision to grant variances under the TCA because the zoning board's denials "were based upon a lack of hardship" to the property. *Id.* at 969, 972. Upon further reflection, I believe that *Fairview* and its progeny, like the Majority here, do not correctly apply the hardship requirement when the MPC is read in conjunction with the TCA.

the Board concluded that Verizon established "a compelling, unnecessary hardship," which "science and engineering" created. (*Id.* at 11.) The Board further concluded that Verizon's proposed cell tower would not "alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare." (*Id.*) Finally, the Board concluded that Verizon "located the tower and its structural mates to 'represent the least modification possible of the regulation in issue.'" (*Id.*) Cognizant that it may not have the effect of prohibiting the provision of personal wireless services, the Board granted Verizon's application.

Similarly cognizant of the limiting effect the TCA has on state and local government authority, Common Pleas affirmed the Board. Applying the TCA, Common Pleas cogently opined that "[n]ot having the ability to make calls or speak with others through one's cellular device due to a district's failure to provide personal wireless services **is a material inhibition of such services**." (Common Pleas' Opinion at 7 (emphasis added).) Because of the **lack of adequate service** within the Township, Common Pleas correctly concluded that the TCA compelled the Board to grant Verizon the variances it requested. Common Pleas explained that courts "must adhere to the [TCA]'s intent to serve **individuals**, **not properties**," as it "is federal legislation that governs the provision of personal wireless services among **individuals**." (*Id.* at 12 (emphasis added).) Thus, Common Pleas affirmed the Board because it "prevented a material inhibition of providing personal wireless services" when it granted Verizon's application. (*Id.* at 7.)

As the Board and Common Pleas astutely observed, there is **no need for a provider to establish a hardship to the property** as required by Pennsylvania law

to receive a variance in these cases. While Pennsylvania courts generally reject variance requests when proof of a hardship to the property is lacking, *see, e.g., Yeager*, 779 A.2d at 598, pursuant to the TCA, courts **cannot reject variance requests** for lack of a hardship to the subject property if it would "prohibit or have the effect of prohibiting the provision of personal wireless services," *see* 47 U.S.C. § 332(c)(7)(B)(i)(II). Thus, rather than failing to properly analyze the hardship requirement, the Board and Common Pleas prudently and astutely concluded that the need for a personal wireless service facility on a specific property can satisfy the hardship required for variance relief in the context of the TCA.

The approach taken by the Board and Common Pleas is consistent with the approach of other jurisdictions. For example, the Supreme Court of New Hampshire has concluded that while an applicant "must show that the hardship is a result of specific conditions of the property and not the area in general" under state law, courts must take "a **broader, more inclusive view of hardship**" to comply with the TCA. *Daniels v. Town of Londonderry*, 953 A.2d 406, 412 (N.H. 2008) (emphasis added). The *Daniels* court explained that when an applicant seeks to construct a wireless telecommunications tower, "the **suitability** of a specific parcel of land for that purpose should be considered for purposes of determining hardship," such as the location, topography, size, and feasible alternatives. *Id.* (emphasis added). Similar to *Daniels*, the Board and Common Pleas considered the fact that the subject property is centrally located in a coverage gap and the proposed telecommunications tower negates any topographical concerns, concluding that the property is a suitable and necessary location for the tower. *Accord Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (explaining that under New York law, a local zoning board must apply a different standard when examining a variance request

from a cellular telephone company and, "[r]ather than granting a variance only on a showing of 'unnecessary hardship,'" must consider whether there is "'a need for its facilities' and whether the needs of the broader public would be served").

It is not surprising that other jurisdictions also take a broader, more inclusive approach because requiring a provider to attempt to establish a hardship to the subject property **before** a zoning board may analyze whether the TCA compels the grant of a variance is **contrary** to the express purpose of the TCA. In the preamble, Congress stated that the **purpose** of the TCA is "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." 110 Stat. 56.[6] To follow the Majority's approach is to focus on an irrelevant issue that requires unnecessary experts, evidence, and proof, and will make variance requests more expensive and take more time, causing delay, expense, inefficiency, and ultimately slowing the deployment of new telecommunications technologies and increasing the cost of telecommunications services for consumers. Indeed, forcing a provider to engage in a proceeding to prove an element that is **irrelevant to the ultimate determination** and likely lacking, and forcing a zoning board to perform an analysis that is not determinative on whether to grant a variance, is time consuming and costly to the provider, the board, and the public. Consequently, there is no benefit to first requiring a determination on whether a provider satisfied the MPC's hardship to the

---

[6] "A preamble, purpose clause, or recital is a permissible indicator of meaning," and "is a key to open the mind of the makers, as to the mischiefs, which are to be remedied, and the objects, which are to be accomplished by the provisions of the statute." *Bittner v. United States*, 598 U.S. 85, 98 (2023) (quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 217 (2012); and then 1 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 459, p.443 (1833)).

property requirement for a variance **before** turning to the TCA, and the Majority's mandate only serves to frustrate the express purpose of the TCA. Therefore, I strenuously disagree with the Majority and find the analysis of the Board and Common Pleas much more consistent with the requirements of the federal TCA.

## II.

Respectfully, I also believe the Majority's interpretation and application of the TCA's requirement that state and local governments, and the instrumentalities thereof, "shall not prohibit or have the effect of prohibiting the provision of personal wireless services" when regulating "the placement, construction, and modification of personal wireless service facilities," **misconstrues** that provision. 47 U.S.C. § 332(c)(7)(B)(i)(II). The Majority resurrects an outdated understanding of the TCA, which focuses on "coverage gaps," instead of an interpretation that best reflects the text and purpose of the provision and the TCA as a whole.

Three decades ago, Congress realized the benefits of opening the telecommunications marketplace to competition, enacting the TCA to "end[] the longstanding regime of state-sanctioned monopolies" in the local telephone markets. *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371 (1999). Through this "unusually important legislative enactment," Congress aimed to promote competition by reducing regulation and encouraging "the rapid deployment of **new** telecommunications technologies." *Reno*, 521 U.S. at 857 (emphasis added) (quoting 110 Stat. 56). The TCA is forward looking, providing "for a pro-competitive, de-regulatory national policy framework designed to **accelerate rapidly** private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210,

1214 (11th Cir. 2002) (emphasis added) (quoting H.R. Conf. Rep. No. 104-458, at 113 (1996), *as reprinted in* 1996 U.S.C.C.A.N. 124, 124). "One of the means by which [Congress] sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 115 (2005).

This may be why the United States Court of Appeals for the Third Circuit has **rejected** its old, outdated standard, the standard that the Majority now adopts. At a time when the industry was young, and cell service in its infancy, the Third Circuit adopted a standard requiring the provider to show its request "is the least intrusive means for closing a **significant gap** in a remote user's ability to reach a **cell site** that provides **access to land-lines**." *APT Pittsburgh Ltd. P'ship v. Penn Township*, 196 F.3d 469, 480 (3d Cir. 1999) (emphasis added) (quoting *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999)). Yes, **land-lines**. In other words, at that time, the provider was required to establish that (1) "its facility will fill an existing significant gap in the ability of remote users to access **the national telephone network**," including "that the area . . . is not already served by another provider," and (2) "the manner in which it proposes to fill the significant gap in service is the least intrusive." *Id.* (emphasis added).

It is not surprising that the Third Circuit **rejected** its outdated *APT Pittsburgh* standard as overly restrictive and unaligned with the current telecommunications marketplace. *Cellco*, 74 F.4th at 105. Recognizing that the coverage-gap-based standard is "**incompatible** with a world where the vast majority of new wireless builds are going to be designed to **add network capacity** and take advantage of **new technologies**, rather than plug gaps in network coverage," the Third Circuit in *Cellco*

interpreted § 332(c)(7)(B)(i)(II) in accordance with the Federal Communications Commission's (FCC) "materially inhibit" standard. *Id.* at 102, 105 (emphasis added) (citation omitted). Now, in the Third Circuit, state or local government action has the effect of prohibiting the provision of personal wireless services "if it **materially limits or inhibits** the ability of any competitor or potential competitor **to compete** in a fair and balanced legal and regulatory **market**." *Id.* at 102 (emphasis added).

The materially inhibit standard accounts for the ever-changing telecommunications landscape. Section 332(c)(7)(B)(i)(II), by its terms, "applies not only when a provider is attempting to fill a gap in its wireless service" by placing and constructing a new facility, "but also when a provider is pursuing 'the introduction of new services or the improvement of existing services'" by modifying an existing facility. *Cellco*, 74 F.4th at 103 (citation omitted). For example, "not only does '**insufficiency in coverage**' ordinarily entitle a provider to a variance but so does **insufficiency in network capacity**, 5G services, or **new technology**." *Id.* at 106 (emphasis added) (citation omitted). Therefore, state or local governments can prohibit or have the effect of prohibiting the provision of personal wireless services "*even if* the provider has already filled all coverage gaps." *Id.* at 103 (emphasis in original). By focusing **beyond coverage gaps**, the materially inhibit standard **better comports** "with the TCA's goals of 'promoting competition, securing higher quality services for American telecommunications consumers and encouraging the rapid deployment of new telecommunications technologies.'" *Id.* at 105 (citation omitted).

Rather than adopt the current Third Circuit interpretation that better reflects what it means to have the effect of prohibiting the provision of personal wireless services in today's world, the Majority takes our state **backwards** to the "coverage-

gap standard," interpreting § 332(c)(7)(B)(i)(II) in accordance with *APT Pittsburgh*. *Abdulhay*, ___ A.3d at ___, slip op. at 18-24.  Despite recognizing that the *APT Pittsburgh* standard does **not** fully comport with the TCA, *see id.*, slip op. at 21-22, the Majority **declines to analyze**, let alone adopt, the materially inhibit standard simply because the Third Circuit in *Cellco* partially relied on the deference afforded to the FCC pursuant to *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Because the Majority believes **any** reliance on *Chevron* deference is inconsistent with the subsequent directive of the Supreme Court of the United States in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Majority simply dismisses the reasoning in *Cellco*.  Respectfully, the Majority overreads *Loper Bright* and in doing so, does not examine whether the court in *Cellco* exercised its independent judgment in determining the meaning of § 332(c)(7)(B)(i)(II), consistent with *Loper Bright*.

In *Loper Bright*, the Supreme Court overruled *Chevron* as inconsistent with Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706.  603 U.S. at 396, 412.  The High Court reasoned that *Chevron* deference "defies the command of the APA" and "the traditional understanding of the judicial function" that "courts must exercise their **independent judgment** in determining the meaning of statutory provisions." *Id.* at 394, 398-99 (emphasis added).  In overruling *Chevron*, however, the Supreme Court did "not call into question prior cases that relied on the *Chevron* framework." *Id.* at 412.  "Mere reliance on *Chevron*," the Supreme Court explained, does **not justify overruling prior cases**. *Id.*  Therefore, **contrary to the Majority's understanding**, a specific case is **not inapplicable** simply because the court based its decision on the deference afforded to government agencies under *Chevron*. *See*

*id.*; *Garcia Pinach v. Bondi*, 147 F.4th 117, 121, 132 (2d Cir. 2025) (explaining that "*Loper Bright* provides no basis . . . to disregard" a prior case).

Although courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous," *Loper Bright* reaffirmed that "**courts may**—as they have from the start—**seek aid from the interpretations of those responsible for implementing particular statutes**." 603 U.S. at 394, 413 (emphasis added). "Such interpretations 'constitute a **body of experience** and **informed judgment** to which courts and litigants may properly resort **for guidance**' consistent with the APA." *Id.* at 394 (emphasis added) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Accordingly, while a court may look to an agency interpretation for guidance in determining the meaning of an ambiguous statute, the court must **exercise its independent judgment** "to determine the best reading of the statute and resolve the ambiguity." *Id.* at 400.

Here, the Majority dismisses the best reading of § 332(c)(7)(B)(i)(II) **without any analysis** simply because the Third Circuit afforded the FCC deference as the court was required to do at the time. However, while the *Cellco* court found that the FCC's interpretation warranted deference, the Third Circuit also **foresaw** the impending *Loper Bright* decision and **exercised its independent judgment** to conclude that the materially inhibit interpretation **is more consistent with the TCA** as a whole than the coverage-gap-based interpretation. *Cellco*, 74 F.4th at 104-05. The Third Circuit explained that interpreting "effect of prohibiting" in § 332(c)(7)(B)(i)(II) to mean "materially inhibits" harmonizes this provision with another provision of the TCA that also uses the phrase "effect of prohibiting." *Id.* at 105. Section 253(a) of the TCA provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect

of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). Federal courts have long interpreted "effect of prohibiting" in § 253(a) to mean "materially inhibits." *Cellco*, 74 F.4th at 105 (citing cases). "[T]o apply one standard under § 253(a) and a different one under § 332(c)(7)(B)(i)(II)," the Third Circuit explained, "would defy the 'basic canon of statutory interpretation that identical words appearing in neighboring provisions of the same statute generally should be interpreted to have the same meaning.'" *Id.* (citation omitted). Therefore, as the Third Circuit reasoned, the materially inhibit interpretation "should also apply to the 'effect of prohibiting' language in § 332(c)(7)(B)(i)(II)." *Id.* Thus, while the Third Circuit in *Cellco* looked to the FCC interpretation for guidance in determining the meaning of an ambiguous statute, the court **exercised its independent judgment** and engaged in thoughtful statutory construction to determine the best reading of the statute **consistent with *Loper Bright.***

Reliable wireless telecommunications services are critical in today's society, where an increasing number of individuals rely on the services as an indispensable part of their daily lives. *See Carpenter v. United States*, 585 U.S. 296, 315 (2018).[7] As the record in this case shows, individuals "rely heavily" on wireless telecommunications services during emergencies and "to stay connected, conduct business and stay in touch with relatives." (Reproduced Record at 67a-68a.) Recognizing the importance of reliable telecommunications services, Congress

---

[7] *See also* Risa Gelles-Watnick, Pew Rsch. Ctr., Americans' Use of Mobile Technology and Home Broadband 4 (2024), https://www.pewresearch.org/wp-content/uploads/sites/20/2024/01/PI_2024.01.31_Home-Broadband-Mobile-Use_FINAL.pdf (noting that in 2023, 95% of adults in the United States used the internet, 90% used a smartphone, and 80% subscribed to high-speed internet).

enacted the TCA and tasked the FCC with achieving "universal service."[8]  *See* 47 U.S.C. § 254.  It is also "the policy of this Commonwealth" that telecommunications services be deployed and maintained at reasonable rates, through Pennsylvania's Universal Service Fund.  Section 3011 of the Public Utility Code, 66 Pa.C.S. § 3011; *see also* 52 Pa. Code §§ 63.161-63.171.  While everyone wants quality wireless service—a requirement for the ubiquitous and necessary use of wireless communications today—"[n]o one wants a wireless communications tower placed in his neighborhood." *PI Tower Dev., LLC v. Charter Township of Chesterfield*, 574 F. Supp. 3d 480, 482 (E.D. Mich. 2021); *see also N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 603 F. Supp. 2d 715, 717 n.4 (S.D.N.Y. 2009) (explaining that "[t]here is a . . . not in my backyard[] problem with regard to these towers").  Properly interpreted, the TCA balances these competing aims by preserving state and local government authority over the siting of cell towers **as long as** the government does not "prohibit or have the effect of prohibiting the provision of personal wireless services." *See* 47 U.S.C. § 332(c)(7)(B)(i)(II).  As the development of telecommunications services across the nation continues to close many of the gaps in coverage, the coverage-gap-based reading of the TCA unduly shifts the balance toward state and local governments and will prevent the ongoing provision of wireless services. *See Cellco*, 74 F.4th at 103.  By its terms, § 332(c)(7)(B)(i)(II) applies beyond attempts to fill coverage gaps, such as when a provider attempts to

---

[8] To achieve "universal service," the FCC uses a "Universal Service Fund" to subsidize "programs for designated populations and facilities needing improved access" to telecommunications services. *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 666 (2025).  For example, the TCA "directs the FCC to provide assistance to rural hospitals, as well as to schools and libraries," and "to expand communications access for consumers in 'rural' and other 'high cost areas.'" *Id.* at 666-67 (quoting 47 U.S.C. § 254).  The Universal Service Fund is a key mechanism to ensure that individuals across the nation have access to vital telecommunications services. *See id.* at 664-70.

improve existing services or introduce new services to maintain affordable and reliable service for the individuals that rely upon it on a daily basis. Because the prohibition in § 332(c)(7)(B)(i)(II) applies **beyond coverage gaps**, the materially inhibit standard better reflects the text of, and balance created by, the TCA in today's world than the *APT Pittsburgh* standard. *Id.* at 103-05.[9]

\*　　\*　　\*

Today, wireless service is critically important—not just for emergencies, or to reach "land-lines"—but for work, school, seeing family, friends, coworkers, entertainment, connecting with others, and myriad other ways. Recognizing the vital importance of telecommunications services, Congress enacted the landmark TCA, and the legislative intent is as relevant and important today, maybe even more so, as it was in 1996. However, the Majority's interpretation and application of this legislation defeats the purpose and intent of the TCA by requiring zoning boards and providers to apply irrelevant and costly requirements to receive necessary variances for cell towers, and resurrecting an outdated and overly restrictive standard to determine whether local zoning regulating "the placement, construction, and modification of personal wireless service facilities" is prohibiting or having the effect of prohibiting the provision of such services. 47 U.S.C. § 332(c)(7)(B)(i)(II). Because the Majority opinion is contrary to the text, intent, and purpose of the TCA, respectfully, I must write separately.

_____

RENÉE COHN JUBELIRER, President Judge

---

[9] This Court should adopt the Third Circuit's materially inhibit interpretation not only because it is the best reading of the TCA but also "so that litigants do not improperly walk across the street to achieve a different result in federal court than would be obtained in state court." *In re Gun Range, LLC*, 311 A.3d 1242, 1248 n.8 (Pa. Cmwlth. 2024) (citation omitted), *cert. denied sub nom.*, *Gun Range, LLC v. City of Philadelphia, Pennsylvania*, 145 S. Ct. 1174 (U.S. 2025).